UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA


IN THE MATTER OF               )

                                    )

THE EXTRADITION OF          )         Case No. 18-MC-81148-UNA/DLB

                                      )

OWEN ALTHELBERT HEADLEY    )

## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to Canada, respectfully requests that the fugitive in this case, Owen Athelbert Headley ("Headley" or "the fugitive") be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States, and sets forth the reasons why Headley should be detained. In short, Headley should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight and danger to the community, and that special circumstances exist warranting his release.

## BACKGROUND

Canada seeks the extradition of Headley to stand trial on charges of sexual assault, in violation of section 271 of the Criminal Code of Canada ("CCC"); incest, in violation of section 155(2) of the CCC; and sexual exploitation, in violation of section 153(1)(a) of the CCC. *See* DE 1-1 at 4. A Justice of the Peace at Brampton, Ontario in Canada issued a warrant for the fugitive's arrest on September 18, 2017, on the basis of the following facts. *Id.* at 26-29.

In 1999, Headley had a daughter, I.H.H., with Rochelle Harris ("Harris") in Minnesota. *Id.* at 34. Although Headley and Harris were no longer in a relationship when I.H.H. was born,

and Headley moved to Florida when I.H.H. was five years old, Headley continued to be a part of I.H.H.'s life. *Id.* Headley is identified as I.H.H.'s father on her State of Minnesota Birth Certificate. *Id.* at 41.

On April 19, 2017, I.H.H. met up with Headley in Florida, and the following day, flew with him to Canada to attend the wedding of Headley's brother, arriving at Pearson International Airport at approximately 1:00 AM on April 21, 2017. *Id.* at 32. Headley and I.H.H. subsequently checked into a room containing two queen size beds in the Monte Carlo Hotel in Brampton, Ontario. *Id.* Headley paid for both I.H.H.'s flight and the hotel in Canada. *Id.* at 34.

According to a videotaped statement provided by I.H.H. to the Anoka County Sheriff's Office, Minnesota, after they got into separate beds and turned out the lights to go to sleep, Headley asked I.H.H. to come over to his bed and give him a goodnight hug. *Id.* at 32. He then asked her to lie down with him. *Id.* I.H.H. complied, and Headley pulled up the covers over them. *Id.* Headley then wrapped his arms around I.H.H. and expressed his love for her. *Id.* He rubbed her bare breast under her shirt, removed her pants and underwear, and then rubbed her vaginal area for approximately five minutes. *Id.* Headley then told I.H.H. that she had got hers and asked if he could have his. *Id.* He removed his clothes and began rubbing himself, including his nipples. *Id.* at 33. He placed himself on top of her, rubbing his penis on her vagina. *Id.* Headley also grabbed I.H.H.'s hand and directed her to rub his nipples. *Id.* Headley then placed the tip of his penis into I.H.H.'s vagina before removing it and ejaculating onto her leg. *Id.* Frozen with fear and disbelief at what was happening, I.H.H. did not try to stop him or tell him to stop. *Id.*

According to I.H.H.'s statement, during the day on April 21, 2017, Headley acted as though nothing had happened. *Id.* At one point, however, he stated that I.H.H. was growing up to be a great woman and expressed a desire to give her a house in Barbados. *Id.* I.H.H. felt that he was trying to bribe her. *Id.* They flew back to Florida together on April 23, 2017, and I.H.H. returned to Minnesota. *Id.* Shortly thereafter, Headley sent her two hundred dollars and began calling her frequently, at one point telling her that she should be on birth control. *Id.* Approximately a month after returning from Canada, I.H.H. saw a doctor, who conducted a sexually transmitted disease test that indicated I.H.H. had chlamydia. *Id.* I.H.H. believes she received chlamydia from Headley, as she did not have any other sexual partners. *Id.* After the appointment, I.H.H. disclosed what Headley had done to her to her mother. *Id.* I.H.H. stated that she did not report the assault immediately out of fear that Headley would leave her in Canada and out of a concern for her father's reputation. *Id.* at 34.

According to I.H.H.'s statement, a similar incident had occurred in February of 2017, when she traveled to Florida to visit her father. *Id.* At that time, Headley touched her breasts and pulled up her skirt while they were sitting on the couch together. *Id.* After they went to sleep in separate bedrooms, Headley called her into his bedroom to talk and rubbed her breasts under her clothing and tried to pull down her skirt as she was lying on his bed. *Id.* He then tried to touch her vagina, and I.H.H. told him to stop. *Id.* Headley expressed his love for her, apologized, and asked her not to tell anyone. *Id.*

In a separate videotaped statement provided to the Anoka County Sherriff's Office, I.H.H.'s mother, Harris, stated that I.H.H. had disclosed Headley's assault in Canada after she had learned that she had chlamydia. *Id.* at 34-35. Harris noted that Headley would often rub his

3

own nipples when she and he had had intimate relations during their relationship. *Id.* at 35. Harris believes that the two hundred dollars Headley sent to I.H.H. following the assault was hush money. *Id.*

In a videotaped statement provided to the Anoka County Sherriff's Office, I.H.H.'s older half-sister, Ravesha Harris ("Ravesha"), stated that Headley began calling her frequently after the April 2017 trip to Canada to discuss I.H.H. *Id.* I.H.H. disclosed both the assault in Canada and the previous incident in Florida to Ravesha following I.H.H.'s diagnosis with chlamydia. *Id.* I.H.H. expressed disbelief at what her father had done to her. *Id.* at 35-36.

Passport and border crossing information confirms that Headley flew from Fort Lauderdale, Florida, to Toronto, Ontario, on April 20, 2017, and returned on April 23, 2017. *Id.* at 37.

On May 17, 2017, a detective with the Peel Regional Police, Special Victim's Unit, in Ontario, contacted Headley by phone to inform him of the pending investigation against him. Headley stated that he would not return to Canada to face any criminal charges. *Id.* at 36.

On February 12, 2018, a detective with the Peel Regional Police, Special Victim's Unit, in Ontario, showed I.H.H. a photograph taken from Headley's Florida driver's license and a still image of Headley taken from video surveillance at the Monte Carlo Hotel in Brampton, on April 23, 2017. *Id.* at 36-37. I.H.H. confirmed that her father, Headley, was the man in both images. *Id.*

Canada has requested that Headley be extradited pursuant to its extradition treaty with the United States (the "Treaty").[1] The United States, in accordance with its obligations under the

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, which entered into force on March 22, 1976, and which was amended by the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc.

Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a

warrant for Headley's arrest. U.S. Magistrate Judge Dave Lee Brannon issued the arrest warrant,

and Headley was arrested on August 29, 2018. Headley is currently in the custody of the U.S.

Marshals Service.

ARGUMENT

## I.      LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.      The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with

a specially defined role for the Court, which is authorized by statute to hold a hearing at which it

determines whether to certify to the Secretary of State that the evidence provided by the

requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v.*

*United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the

Court, then decides whether the fugitive should be surrendered to the requesting country. 18

U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir.

1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal

issues peculiarly suited for judicial resolution, such as questions of the standard of proof,

competence of evidence, and treaty construction, yet simultaneously implicate questions of

foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*,

110 F.3d 103, 110 (1st Cir. 1997).

---

No. 101-17 (1990), and by the Second Protocol Amending the Extradition Treaty with Canada of
January 12, 2001, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B.      The requirements for certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See In re Extradition of Martinelli Berrocal*, No. 17-22197-Civ-TORRES, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections briefly discuss each of those requirements.

1.     <u>Authority over the proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). The Local Rules specifically delegate the authority to handle extradition matters to magistrate judges. Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

2.     <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as Headley, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3.     <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Kastnerova*, 365 F.3d at 987 (dismissing *habeas* petition challenging certification of extradition, because, among other reasons, district court did not err in

7

determining extradition treaty to be valid); *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Canada. The Court must defer to the Department of State's determination in that regard. *Kastnerova*, 365 F.3d at 985-87.

4.     Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, an extraditable offense, as that term is defined under the Treaty.

Article 2 of the Treaty defines offenses as extraditable if the criminal conduct is punishable under the laws of both the United States and Canada by imprisonment or other form of detention for a term exceeding one year or any greater punishment. In assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by Canada in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Gallo–Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, *4 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law

of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel*, 190 U.S. 40, 61 (1903)). A requesting country need not establish that its crimes are identical to ours. *Schmeer v. Warden of Santa Rosa County Jail*, No. 14-cv-285, 2014 WL 5430310, at *2 (N.D. Fla. Oct. 22, 2014) ("Dual criminality requires only that the 'particular act charged is criminal in both jurisdictions' . . .") (quoting *Collins v. Loisel*, 259 U.S. 309, 312 (1922)). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312.

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor*, 290 U.S. at 298-300; *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5.      Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Canada were committed by the person before the Court. *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The

evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to

"believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*,

420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's

probable cause determination is "not a finding of fact 'in the sense that the court has weighed the

evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function

of indicating those items of submitted evidence on which the decision to certify extradition is

based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted).

### C.    An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of

each charge for which extradition is requested under the applicable extradition treaty; it is not to

determine the guilt or innocence of the fugitive—that determination is reserved for the foreign

court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an

extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is

"an administrative proceeding arising under international law for certification and approval of

the State Department's decision to extradite this person at the request of a foreign government,"

*See In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017); and it

is governed by "the general extradition law of the United States and the provisions of the

Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g.*,

*Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid.

1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous

proceedings such as extradition or rendition."). Indeed, hearsay evidence is admissible at an

extradition hearing, and, moreover, "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. *See, e.g.*, *Afanasjev*, 418 F.3d at 1164-65; *see also* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."). A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1282-83 (collecting cases holding that there is no right to cross-examination in extradition hearing); there is no Sixth Amendment

11

right to a speedy trial, *see, e.g.*, *Martin* 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Batchedler*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding.") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1281. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Schmeer*, 2014 WL 5430310, at *4. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do."). "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or

12

of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases);

*Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5. These issues, which require factual or credibility

determinations, are reserved for the courts in the requesting country to resolve after the fugitive

is extradited.

### D.      Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to

the requirements for certification, are to be considered by the Secretary of State, not by the

Court. *See* 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a

fugitive's contentions that an extradition request is politically motivated, that the requesting

state's justice system is unfair, or that extradition should be denied on humanitarian grounds.

*Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition

proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian

considerations are matters properly reviewed by the Department of State.") (citation omitted);

*Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter

for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary

of State has sole discretion to determine whether a request for extradition should be denied

because it is a subterfuge made for the purpose of punishing the accused for a political crime, or

to refuse extradition on humanitarian grounds because of the procedures or treatment that await a

surrendered fugitive") (citation omitted). This practice is consistent with the long-held

understanding that the surrender of a fugitive to a foreign government is "purely a national act . .

. performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.    HEADLEY SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[2] *See In re Extradition of Shaw*, No. 14–MC–81475–WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.    Applicable law

1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper

---

[2] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Headley is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Canada.

> warrant, and the other government is under obligation to make the surrender; an
> obligation which it might be impossible to fulfill if release on bail were permitted.
> The enforcement of the bond, if forfeited, would hardly meet the international
> demand; and the regaining of the custody of the accused obviously would be
> surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *Shaw*, 2015 WL

15

521183, at *5.[3] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

      In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Shaw*, 2015 WL 521183, at *6; *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case

---

[3] "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Shaw*, 2015 WL 521183, at *8; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *In re Extradition of Antonowitz*, 244 F. Supp. 3d 1066, 1070 (C.D. Cal. 2017); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

**B.    Analysis**

The Court should detain Headley without bond. Headley is a flight risk and danger to the community. As an initial matter, a fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending

18

charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)).

Here, Headley has already expressed his intention to avoid returning to Canada to face justice. *See* DE 1-1 at 36. He has also allegedly attempted to conceal the charged conduct by requesting that I.H.H. not tell anyone what happened and by attempting to buy her silence. *See id.* at 33-35. In addition, Headley has indicated that he has access to resources in at least one other foreign country, Barbados, and travel records indicate that he has traveled there at least twice in the past year and a half. *See id.* at 33, 37. Hence, flight from the United States to another country or to an underground location in the United States to avoid prosecution is a reasonable assumption. Moreover, the seriousness of the offenses with which Headley is charged, two of which carry maximum terms of imprisonment of fourteen years and the other of which carries a maximum term of imprisonment of ten years, renders him a significant flight risk. *See id.* at 12-15; *see, e.g.*, *Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). Given the serious nature of the alleged crimes involving rape of a minor, the community both here in the United States and abroad would be at risk were he to be released. Allowance of bail in any amount would not guarantee Headley's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Headley's risk of flight and danger to the community is alone sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that

Headley is not a flight risk and poses no danger to the community here or abroad, the government is unaware of any "special circumstances" that would justify bail in this case.

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Canada, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## III.   CONCLUSION

For the foregoing reasons, the United States requests that Headley be detained pending resolution of this extradition proceeding.

Dated: September 7, 2018                          Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

 s/  LOTHROP MORRIS
By: LOTHROP MORRIS
ASSISTANT U.S. ATTORNEY
Florida Bar # 0095044
500 Australian Avenue, Suite 400
West Palm Beach, FL 33401
(561) 820-8711
(561) 820-8777 (FAX)
LOTHROP.MORRIS@USDOJ.GOV

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 7, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: s/  LOTHROP MORRIS
LOTHROP MORRIS
ASSISTANT U.S. ATTORNEY