UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-mc-81148-UNA

IN THE MATTER OF THE
EXTRADITION OF
OWEN ALTHELBERT HEADLEY.
_____/

FILED by _____ D.C.

OCT 1 0 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER DENYING BOND IN EXTRADITION PROCEEDING

THIS CAUSE came before the Court upon the Government's Request for Detention Pending Extradition Proceedings [DE 17], filed on September 7, 2018. Defendant[1] Owen Headley filed his Request for Release Pending his Extradition Hearing and Possible Appearance in Ontario, Canada [DE 27] on September 26, 2018. Defendant has submitted supplemental filings in support of his request for release pending his extradition hearing on September 30, 2018 [DE 30], and on October 1, 2018 [DE 31, DE 32]. The Court held a lengthy bond hearing on the pending Motions on October 2, 2018. Thereafter, after taking the matter under advisement, the Court orally denied bond in open court on October 5, 2018. [DE 38]. This written Order more fully explains the Court's rationale for denying bond.

### I.     Procedural Background

On August 27, 2018, the United States Attorney's Office filed a Complaint [DE 1] in this District seeking a warrant for Defendant Owen Althelbert Headley's arrest. This Court issued an arrest warrant and Defendant was arrested by the United States Marshals in Delray Beach, Florida, on August 27, 2018. [DE 4]. Defendant's initial appearance occurred on August 29, 2018. [DE 8]. The United States was acting on the request of the Government of Canada,

---

[1] When referring to a person subject to an international extradition request, courts use the varied terms Relator, Extraditee, Accused, or Defendant. For convenience and consistency purposes, this Court will refer to Mr. Headley as Defendant.

pursuant to its extradition treaty[2] with the United States ("the Treaty"). Canada seeks the extradition of Defendant to stand trial on three charges: sexual assault, in violation of section 271 of the Criminal Code of Canada ("CCC"); incest, in violation of section 155(2) of the CCC; and sexual exploitation, in violation of section 153(1)(a) of the CCC. The alleged offenses were committed within the jurisdiction of Canada. A warrant for Defendant's arrest was issued on September 18, 2017, in Brampton, Ontario, along with an information charging Defendant with the three Canadian offenses identified above. [DE 20, pg. 3]. On September 11, 2018, an amended information and warrant were issued to correct an error with respect to Defendant's birth year. *Id.*

On September 7, 2018, the Government filed a Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings [DE 17]. On September 26, 2018, Defendant filed his Request for Release Pending his Extradition Hearing and Possible Appearance in Ontario Canada. [DE 27]. A bond hearing was scheduled for October 2, 2018. [DE 26].

## II. **Factual Background**

According to Canadian authorities, Defendant traveled with his 17-year old daughter, I.H.H., to Canada to attend the wedding of Defendant's brother on April 20, 2017. [DE 20, pg. 4]. They arrived at Pearson International Airport at approximately 1:00 a.m. on April 21, 2017, and checked into a room containing two queen size beds at the Monte Carlo Hotel in Brampton, Ontario. *Id.* Defendant paid for his daughter's flights and hotel room. *Id.* According to a

---

[2] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, which entered into force on March 22, 1976, and which was amended by the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-17 (1990), and by the Second Protocol Amending the Extradition Treaty with Canada of January 12, 2001, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002)

2

videotaped statement provided by I.H.H. to the Anoka County Sheriff's Office in Minnesota, after they got into separate beds and turned out the lights to go to sleep, Defendant asked I.H.H. to come over to his bed and give him a goodnight hug. *Id.* He then asked her to lie down with him. *Id.* I.H.H. complied, and Defendant pulled up the covers over them. *Id.* Defendant then wrapped his arms around I.H.H. and expressed his love for her. *Id.* He then allegedly sexually assaulted I.H.H. *Id.* According to I.H.H.'s statement, she was frozen with fear and disbelief at what was happening and did not try to stop Defendant or tell him to stop. *Id.*

According to I.H.H.'s statement, during the day on April 21, 2017, after the alleged incident, Defendant acted as though nothing happened. [DE 20, pg. 5]. At one point, he told his daughter that she was growing up to be a great woman and expressed a desire to give her a house in Barbados. *Id.* They flew back to Florida together on April 23, 2017, and I.H.H. returned to her home in Minnesota. *Id.* Soon thereafter, Defendant sent I.H.H. two hundred dollars. I.H.H. stated that Defendant began to call her frequently, and at one point told her to begin taking birth control. *Id.* Approximately one month after returning from Canada, I.H.H. visited a doctor and was tested for sexually transmitted diseases. *Id.* The test indicated that I.H.H. had chlamydia, and I.H.H. believes she received chlamydia from Defendant, because she did not have other sexual partners. *Id.* After the appointment with her doctor, I.H.H. told her mother what happened in Canada, and stated that she did not report the assault immediately because she was afraid that Defendant would leave her in Canada, and she was afraid for his reputation. *Id.*

In her statement, I.H.H stated that a similar incident had occurred in February, 2017, when she visited her father in Florida. *Id.* At that time, I.H.H. stated that Defendant touched her breasts and pulled up her skirt while they were sitting on the couch together. *Id.* After they went to sleep

in separate bedrooms, Defendant called her into his bedroom to talk and rubbed her breasts under her clothing and tried to pull down her skirt as she was lying on his bed. *Id.* He then tried to touch her vagina, and I.H.H. told him to stop. [DE 20, pg. 6]. Defendant expressed his love for her, apologized, and asked her not to tell anyone. *Id.*

Passport and border crossing information confirms that Defendant flew from Fort Lauderdale, Florida, to Toronto, Ontario on April 20, 2017 and returned on April 23, 2017. *Id.* On May 17, 2018, a detective with the Peel Regional Police, Special Victim's Unit, Ontario, Canada, contacted Defendant by phone to inform him of the pending investigation against him. According to the detective, Defendant stated that he would not return to Canada to face any criminal charges. [DE 20, pg. 7].

### III. The October 2, 2018 Bond Hearing

At the October 2, 2018 bond hearing, the Government presented the testimony of Supervisory Deputy United States Marshal Roberto Rodriguez, who helped to locate Defendant and assigned a deputy to arrest the Defendant on the arrest warrant issued in this case. Marshal Rodriguez testified that he first received a notification of an investigation into Defendant from the international branch of the United States Marshals on July 26, 2018. As part of his duties, Marshal Rodriguez identified the subject of the extradition as Defendant Owen Headley and began to gather information about the subject to ensure that the subject was the correct person being sought for extradition. Marshal Rodriguez then assigned the case to another Marshal, who would conduct surveillance at the address they had for the subject, in order to confirm that the subject lived there. On August 7, 2018, United States Marshals conducted surveillance at 2655 Dorson Way, Delray Beach, Florida. The Marshals observed a vehicle which was registered to

Defendant, and then observed Defendant take out the trash at the residence. The Marshals confirmed that Defendant resided at the subject residence on August 7, 2018, and conducted no more surveillance at the property.

On August 27, 2018, the arrest warrant was issued and Marshal Rodriguez assigned Deputy Marshal Josh Bostley to arrest Defendant at his home in Delray Beach. Deputy Marshal Bostley initiated an operation plan to execute the warrant against Defendant and in the early morning of August 29, 2018, Deputy Marshal Bostley knocked on Defendant's front door in order to arrest Defendant. An unidentified male answered the front door, and when the Marshals asked for Defendant, the male stated that Defendant did not live there and that the Marshals had the wrong house. When the Marshals asked how many other people were in the home, the male said two others were present. However, after the Marshals asked everyone in the house to come outside, they noticed that there were three other people in the house. The Marshals then entered the home to clear it, and while clearing the home, they found Defendant in a room with the door closed. After Defendant confirmed his identity, the Marshals took him into custody.

The Government introduced the Declaration of Katherine C. Fennell [DE 9-1, pgs. 1-3], the Certificate of Elizabeth Mayfield [DE 9-1, pg. 6], and the Affidavit of Erica Whitford [DE 9-1, pgs. 9-18] without objection from Defendant.

Defendant sought to introduce several defense exhibits, which the Court admitted without Government objection. Defense Exhibit 1 [DE 27-1] is an affidavit of Coral Marshall, Defendant's sister, who was present at the wedding in Canada and who asserts that I.H.H. showed no indication that she was mistreated in anyway over the course of the weekend. Defense Exhibit 2 [DE 27-2] is an affidavit of David Reid, Defendant's brother, who was also present at

the wedding in Canada and who asserts that I.H.H was interacting with her father in a normal manner, consistent with her behavior in the past, on April 21, 2017, the day after the alleged assault. Mr. Reid also stated that he believed I.H.H. made the allegations for financial gain. Defense Exhibit 3 [DE 27-3] is the affidavit of Jacqueline Headley [DE 27-4, DE 30-4 (redacted version)], Defendant's sister, who was also present at the wedding in Canada, and who asserts that I.H.H. never confided in her regarding any abuse and showed no signs of any mental or emotional distress that weekend. Defendant Exhibit 4 [DE 27-4] is an affidavit of Amaris Kellman, the niece of Defendant and cousin of I.H.H., who was also present at the wedding in Canada and who spent much of the weekend at issue alone with I.H.H. Ms. Kellman asserts that she has a close relationship with I.H.H. and believes that I.H.H. would have confided in her if I.H.H. had been mistreated in any way. Defense Exhibit 6 [DE 27-6] is Defendant's passport. Defense Exhibit 8 [DE 27-8] is Defendant's travel receipts, including airfare, rental car, and hotel. Defense Exhibit 10 [DE 27-10] is an incident report from the School Police Department in Palm Beach County, Florida, documenting an incident which occurred on March 5, 2009, where a student attacked Defendant and Defendant chose not to file any charges and helped to calm the student down. Defense Exhibit 11 [DE 27-11] is travel receipts from Defendant's trip to Minnesota in May 2017. Defense Exhibit 12 [DE 27-12] is a thank-you letter to Defendant from one of his students. Defense Exhibit 13 [DE 27-13] is a record of Defendant's child support payments for I.H.H., showing that the payments have been made to I.H.H.'s mother in full. The Court also admitted Defense Exhibits 14, 15, 16, 17, 18, and 19, and 21, which are all letters from Defendant's colleagues and family members in support of his character. [DE 30-1, DE 30-2, DE 30-3, DE 31-1, DE 31-2, DE 31-3, DE 32-1].

Defendant also sought to introduce three defense exhibits, which the Court admitted over the Government's objection to the relevancy of the exhibits. These exhibits include: Defense Exhibit 5 [DE 27-5], which is a letter from Defendant's doctor, Dr. Louis Tumminia, D.O., which states that Defendant is a patient of Dr. Tumminia and that he has never been treated or diagnosed with chlamydia or any sexually transmitted disease; Defense Exhibit 7 [DE 27-7, DE 30-5 (redacted version)], which is a Register of Actions from Minnesota, showing that I.H.H. pled guilty to possession of drug paraphernalia in Minnesota on April 30, 2018; and Defense Exhibit 20 [DE 31-4, DE 31-5], which are Defendant's Medical Records. The Court admitted the three exhibits but reserved ruling as to what weight, if any, to give to the three contested exhibits.

Defendant also called several witnesses. Defendant first called attorney Lewis Hanna, who had previously represented Defendant regarding the underlying domestic violence case in Minnesota in 2017. Mr. Hanna testified that he advised Defendant to retain an attorney in Minnesota because Mr. Hanna was licensed to practice in Florida. However, Defendant lost his case in Minnesota and expressed disappointment to Mr. Hanna in the lawyer he hired in Minnesota. After he learned of the loss in Minnesota, Mr. Hanna stated that he made a formal request for a re-hearing in Minnesota and he began preparing for Defendant's defense. Mr. Hanna testified that he began reaching out to family members, made Defendant get a blood test for chlamydia, and requested Defendant's medical records. Mr. Hanna also testified that he spoke to a detective in Palm Beach County regarding the charges and told her that Defendant was willing to speak with her with a lawyer present, but the detective never contacted him again.

Next, Defendant called as a witness his sister, Carolanne Kellman. Ms. Kellman testified that she lived in the family home, located at 809 SW 11th Avenue in Delray Beach, Florida, with her

siblings and parents. She testified that the home had been in their family for forty years, ever since they moved to the United States from Barbados. Ms. Kellman became a United States citizen in 1996. Ms. Kellman also testified that she did not think Defendant would ever move to Barbados.

Anthony Donaldson, a coworker of Defendant, testified next. Mr. Donaldson testified that he had worked with Defendant for over five years, and that he became very close with Defendant's family. He also stated that Defendant was loved by his students and colleagues, and that his character is "beyond reproach." Mr. Donaldson testified that he attended the wedding in Canada and stayed in the same hotel, although not in the same room, as Defendant and I.H.H. Mr. Donaldson stated that he spent most of the weekend with Defendant and I.H.H., and he observed nothing to show that I.H.H. was disturbed or upset at any time.

Next, Amaris Kellman, Defendant's niece and I.H.H.'s cousin, testified. Ms. Kellman testified that she spent most of the weekend with I.H.H., including getting ready for the wedding, attending the wedding, and getting late night food after the wedding together. Ms. Kellman also stated that she was not in the hotel room when the alleged incident occurred, but she added that she felt that she and I.H.H. had a close relationship and she believed that I.H.H. would have told her if an assault had occurred.

Defendant's brother, Clevis Headley, a professor at FAU, testified next. Professor Headley testified that he attended the court hearing in Minnesota with Defendant, after Defendant showed him the court papers. Professor Headley was born in Barbados and became a United States citizen in 2008. He also testified that he and members of his family are law abiding citizens and that they would be willing to use their family home as collateral for a bond. Professor Headley

testified that his brother denied all the allegations lodged against him. He also stated that the family has many family members living in Barbados, and Defendant often traveled to Barbados to see family.

Finally, Defendant Owen Headley testified. Defendant testified that he had never been arrested and that he had never used any false identification. He also stated that I.H.H.'s allegations were false and that he never touched his child. Although he moved to Minnesota for college and worked there for several years, he moved back to Florida in 2004, when his daughter was five years old. Defendant added that he always paid his child support in full, and has paid more than one hundred thousand dollars in total over the last eighteen years. Defendant also stated that the money he gave to his daughter was not "hush money," but rather money for the baggage fees on her flight and money to keep in her pocket.

Defendant testified that he gave his passport to his attorney, but he did have the funds to fly to Barbados if he wanted to. He stated that he would not flee to Barbados because he would not have money to live there, and his home and his family were in South Florida. Defendant also stated that he would abide by any conditions if he were to be released. Defendant refuted the Government's assertion that he told a detective in Canada that he would not return to Canada. Defendant testified that he talked to a Canadian detective on the phone, and he told the detective that he could go to Canada after June 5, 2018, when the school year ended. He also stated that he did not feel that Canada would give him a fair trial, based on their investigation thus far. Defendant also refuted the United States Marshal's testimony that he tried to hide from law enforcement. Defendant testified that he woke up after the Marshals arrived at his house and he immediately had to use the bathroom due to health issues. Defendant testified that he fully

complied with the orders given by the Marshals. Defendant also testified that he has continued to teach and to participate in bible studies while incarcerated at the Palm Beach County jail.

Defendant stated that he believed his daughter was making up the allegations at the behest of her mother. He added that he believed his child support payments were I.H.H.'s mother's main source of income. He also added that he thought his daughter was having issues with drug use, because she had been kicked out of her dorm and she was arrested for possession of drug paraphernalia. He testified that he discussed birth control with his daughter and that she called him to tell him that she had received a form of birth control from the doctor.

Defendant testified that he would return to Canada if he were ordered to do so, and that the detective's statement that Defendant said he would not return to Canada was a false statement. Defendant stated that because he is a citizen of Barbados, it would be possible for him to obtain a Barbados passport. Defendant became a United States citizen in 1989. Defendant also refuted his daughter's allegation that he assaulted her at his home in Florida in February of 2017.

Finally the defense proffered that Amaris Kellman would testify that I.H.H. smuggled marijuana into Canada to smoke during the wedding weekend. The defense also proffered that Defendant's fiancé would testify that Defendant was in the bathroom when the Marshals entered the home.

The Government argued that in extradition cases, there is a presumption against bond, and that Defendant had not shown the existence of any special circumstances justifying his release on bond. The Government also argued that Defendant posed a significant risk of flight due to his significant ties to Barbados, his incentive to flee, the seriousness of the charges lodged against him, the fact that Defendant stated he did not believe he would receive a fair trial in Canada, his

statement to the Canadian detective that he would not return to Canada, his claim that the U.S. Marshals are lying in their reports regarding his arrest, and his attempt to conceal his conduct by giving his daughter money. The Government also asserted that Defendant is a danger to the community, based on the allegations that he sexually assaulted his daughter on two occasions.

In response, Defendant argued that there is no indication that he poses a significant risk of flight or non-appearance, because he has insisted that he would return to Canada if ordered to do so. Defendant also pointed out that there is a difference between following the law and returning to Canada for trial, and in mistrusting the investigation of Defendant by the Canadian authorities. Defendant pointed out that although he has traveled often to Barbados, he has always returned as scheduled, even over the past year after he was made aware of these allegations. Defendant also pointed to his substantial family support and the fact that his family was willing to use the family home of more than forty years as collateral for a bond.

Finally, Defendant argued that the totality of the circumstances in his case should constitute special circumstances enabling him to receive a bond while pending extradition to Canada. Defendant pointed to the following factors: Defendant has never had any contact with the criminal justice system prior to the allegations in this case; Defendant has never evaded or attempted to evade authorities; Defendant is a respected educator in the community and has the support of many co-workers; there is a high probability that Defendant will succeed on the merits of his case; Defendant and Defendant's family have significant ties to South Florida including the family home, which has been in the family for more than forty years; Defendant's family is willing to accept and undertake any and all responsibilities required by a reasonable bond package; and Canada allows for bond in the charges alleged against Defendant.

## IV. ANALYSIS OF APPLICABLE EXTRADITION LAW

A foreign or international extradition proceeding is not a criminal case. *Martin v. Warden, Atlanta, Pen.*, 993 F.2d 824, 829 (11th Cir.1993); *Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir.1984). "Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature and set forth their own law." *In re Extradition of Mohammad Safdar Gohir*, 2014 WL 2123402, at *6 (D.Nev.2014); *In re Extradition of Vargas*, 978 F.Supp.2d 734, 744 (S.D. Texas 2013). The process of formal extradition is a diplomatic process, governed generally by the applicable extradition treaty and the federal extradition statute, 18 U.S.C. §§ 3181–3196. *In re Extradition of Mohammad Sadfar Gohir, supra,* at *6.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to international extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *Afanesjev v. Hurlburt,* 418 F.3d 1159, 1164–65 (11th Cir.2005); *Melia v. United States,* 667 F.2d 300, 302 (2d Cir.1981); *Bovio v. United States,* 989 F.2d 255, 259 n. 3 (7th Cir.1993).

There is little statutory guidance on the issue of bond or release pending future proceedings in extradition matters. The Bail Reform Act does not apply to extradition proceedings. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2); *In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015); *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D.Nev.1993); *In re Extradition of Mohammad Sadfar Gohir, supra,* 2014 WL 2123402, at *11. As such, "[f]ederal district courts have almost exclusively, and by necessity, developed a federal common law to fill in the gaps left by current legislation for bail determinations in foreign extradition cases." *In re Extradition of Garcia*, 761 F. Supp. 2d

468, 470 (S.D. Tex. 2010). "This lack of guidance has created contradictory, and often irreconcilable, lower court opinions on the subject of bail availability for defendants facing international extradition." *Id.*

There is a presumption against bond in extradition proceedings, reflecting the value placed on the United States fulfilling its obligations under international law to the requesting country. *Wright v. Henkel,* 190 U.S. 40, 62–63, 23 S. Ct. 781, 47 L.Ed. 948 (1902); *In re Extradition of Russell,* 805 F.2d 1215, 1216–1217 (5th Cir.1986); *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 827 (11th Cir.1993); *Matter of Extradition of Ricardo Alberto Martinelli Berrocal,* 263 F. Supp. 3d 1280, 1306 (S.D. Fla. 2017); *In re Extradition of Jacques Pelletier,* 2009 WL 3837660, at *3 (S.D. Fla. 2009). This is because in a foreign or international extradition, the United States is obligated to deliver the person after he is apprehended, and granting bond could make that obligation impossible to fulfill. *Wright v. Henkel, supra,* 190 U.S. at 62; *In re Extradition of Jacques Pelletier, supra,* 2009 WL 3837660, at *3.

A Defendant in an extradition case will be released on bond only if he can prove "special circumstances." *Wright v. Henkel, supra,* 190 U.S. at 63; *Martin v. Warden, Atlanta Pen., supra,* 993 F.2d at 827; *In re Extradition of Ghandtchi,* 697 F.2d 1037, 1038 (11th Cir.1983); *In re Extradition of Shaw,* 2015 WL 521183, at *5; *In re Extradition of Jacques Pelletier, supra.* "[C]ourts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extradites." *In re Extradition of Shaw,* 2015 WL 521183, at *4–6; *In re Extradition of Garcia,* 761 F. Supp. 2d at 472. However, what exactly constitutes "special circumstances" has yet to be defined. Courts

have only described this concept in the abstract, leaving trial courts without specific factors or parameters to follow. *Id.*

Bail in extradition proceedings is granted only upon a showing that a defendant is neither a risk of flight, nor a danger to the community, and that special circumstances warrant the defendant's release. *United States v. Taitz*, 130 F.R.D. 442, 444–45 (S.D. Cal. 1990); *In re Extradition of Garcia*, 761 F. Supp. 2d at 473–74; *In re Extradition of Shaw*, 2015 WL 521183, at *4.

The Defendant bears the burden of proof of establishing that he is neither a flight risk, nor a danger to the community, and that special circumstances warrant his release. *Salerno v. United States*, 878 F. 2d 317, 318 (9th Cir.1989); *In re Extradition of Garcia, supra,* 761 F. Supp. 2d at 474; *United States v. Leitner*, 784 F. 2d 159, 160 (2d Cir.1986).

Some courts have determined that a defendant must meet his burden by clear and convincing evidence. *See, e.g., In re Extradition of Mohammad Gohir, supra,* 2014 WL 2123402, at *11; *United States v. Ramnath*, 533 F. Supp. 2d 662, 665–66 (E.D.Tex.2008). Other courts have held that a preponderance of the evidence standard applies. *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n. 4 (C.D.Cal.2006); *In re Extradition of Garcia, supra,* 761 F. Supp. 2d at 474–75.

"The case law also reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis." *In re Garcia*, 761 F. Supp. 2d at 472. The courts that examine risk of flight and special circumstances separately thus "require the potential extradite to establish the following two factors before [they] can grant bail in a foreign

extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community." *Id.* at 472–73; *In re Extradition of Shaw*, 2015 WL 521183 at *4–6.

In sum, though unusual and extraordinary, it is not impossible to obtain bond in international extradition proceedings. *Nacif–Borge, supra,* 829 F. Supp. at 1213; *In re Extradition of Gohir, supra,* 2014 WL 2123402, at *11.

## V. NO SPECIAL CIRCUMSTANCES EXIST IN THIS CASE

Determining the existence of special circumstances involves a fact-specific inquiry, and special circumstances will be found only where justification for release is clear. *In re Extradition of Shaw*, 2015 WL 521183, at *4–6; *See, e.g., United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979); *Ramnath, supra,* 533 F. Supp. 2d at 666–67. In this case, the Court does not find a clear justification for release, and finds that Defendant Headley failed to prove the existence of special circumstances warranting his release on bond pending extradition.[3]

Defendant's argument that he has a high probability of succeeding on the merits of his case at trial in Canada, and therefore he should be permitted to be released on bond, does not constitute a special circumstance in this case. While courts have recognized that a substantial likelihood of success at the extradition hearing may constitute a special circumstance, this is limited to the merits of the extradition, and not of the underlying case. *In re Extradition of Shaw*, 2015 WL 521183 at *7; *See United States v. Liu Kin–Hong,* 83 F.3d 523, 524 (1st Cir. 1996); *Salerno, supra,* 878 F.2d at 317; *In re Extradition of Mironescu,* 296 F. Supp. 2d 632,

---

[3] The Court notes, as discussed previously in Section IV of this Order, that there is a conflict among the courts as to whether a defendant must prove the existence of a special circumstance by a preponderance of the evidence standard, or by the higher clear and convincing evidence standard. The Court does not need to address this conflict however, because it finds that Defendant Headley has failed to meet his burden by the lower preponderance of the evidence standard and, therefore, he necessarily has not met the higher clear and convincing evidence standard.

15

634–35 (M.D.N.C.2003); *In re Extradition of Sacirbegovic,* 280 F. Supp. 2d 81, 88 (S.D.N.Y.2003); *In re Extradition of Gonzales,* 52 F. Supp. 2d 725, 737 (W.D. La.1999); *Nacif–Borge, supra,* 829 F. Supp. at 1216. The judicial officer's inquiry in an international extradition hearing is limited to a very narrow set of issues regarding the existence of a treaty, the offense charged, and the quantum of evidence offered. *In re Extradition of Shaw,* 2015 WL 521183 at *7. If those factors are established, the judicial officer shall certify extraditability. *Id.* "The larger assessment of extradition and its consequences is committed to the Secretary of State." *United States v. Kin–Hong,* 110 F.3d 103, 111 (1st Cir. 1977). At this point, the Defendant has not presented sufficient evidence to establish that he has a high probability of success on the merits at the extradition hearing. It has been established that the extradition treaty in force between the United States and Canada was in full force and effect at all times relevant to this action, and encompasses the charges lodged against Defendant. It has also been established that the Owen Headley sought by Canada and the Owen Headley arrested in this District for extradition and brought before the Court are the same person, and that there is probable cause to believe that Defendant committed the offenses for which extradition is sought. In fact, Defendant has waived his right to an extradition hearing and the Court has entered an Order certifying extraditability. [DE 46]. Therefore, the Court finds that there is a very low probability that Defendant would succeed on the merits at his extradition hearing.

Although Defendant has demonstrated immense support from the many members of his family, the Court must also consider that the serious charges lodged against him were alleged by a close family member, his daughter. And while Defendant did have some community support from colleagues, that support is not so widespread as to constitute a special circumstance in this

case. Further, the availability of bail in Canada is not a special circumstance. *See Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1299. Finally, the Court notes that the good character, lack of criminal record, and U.S. citizenship of a defendant do not constitute special circumstances warranting release. *In re Extradition of Pelletier*, No. 09-22416-MC, 2009 WL 3837660, at *2 (S.D. Fla. Nov. 16, 2009); *Matter of Extradition of Berrocal*, 263 F. Supp 3d at 1300; *In re Extradition of Shaw*, 2015 WL 521183 at *7; *See Martin v. Warden, supra*, 993 F.2d at 827–28; *see also In re Extradition of Sacirbegovic, supra*, 280 F. Supp. at 84. In sum, the Defendant has failed to demonstrate by a preponderance of the evidence that there are special circumstances in this case which warrant his release on bond pending extradition.

In light of the Court's finding that no special circumstances exist in this case, the Court need not address the issue of whether Defendant is a significant risk of flight or non-appearance or whether Defendant poses a danger to the community.

## VI. <u>CONCLUSION</u>

The Court has carefully reviewed all the evidence, including the authenticated original Formal Request for Extradition together with all of its Declarations and exhibits, the Defendant's exhibits, and the parties' arguments and filings.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendant's request for release on bond pending extradition is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 10th day of October, 2018.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE